Slip Op. 11-142

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| _____ | : | |
| CLEARON CORPORATION and | : | |
| OCCIDENTAL CHEMICAL | : | |
| CORPORATION, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| | : | |
| UNITED STATES, | : | Court No. 08-00364 |
| | : | |
| Defendant, | : | **Public Version** |
| | : | |
| and | : | |
| | : | |
| ARCH CHEMICALS, INC., | : | |
| | : | |
| Defendant-Intervenor. | : | |
| _____ | : | |

OPINION AND ORDER

[The Final Results are remanded.]

Dated: November 18, 2011

*Gibson, Dunn, & Crutcher LLP* (*Daniel J. Plaine*, *J. Christopher Wood*, *Andrea F. Farr*, and *Zia C. Oatley*), for plaintiffs Clearon Corporation and Occidental Chemical Corporation.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David F. D'Alessandris*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Brian Soiset*), of counsel, for defendant United States.

*Blank Rome LLP* (*Peggy A. Clarke* and *Roberta Kienast Daghir*), for defendant-intervenor Arch Chemicals, Inc.

Eaton, Judge:  This action is before the court on the motion
of Clearon Corporation and Occidental Chemical Corporation
(collectively, "plaintiffs") for judgment on the agency record
pursuant to USCIT Rule 56.2.[1]  The motion challenges certain
aspects of the United States Department of Commerce's ("Commerce"
or the "Department") Final Results of the Second Administrative
Review of the antidumping duty order on chlorinated
isocyanurates[2] from the People's Republic of China ("PRC"), in
which Commerce assigned dumping margins to Chinese respondents
Hebei Jiheng Chemical Corporation, Ltd. ("Jiheng") and Nanning
Chemical Industry Co. Ltd. ("Nanning")[3] of 0.80% and 53.67%,
respectively.  *See* Chlorinated Isocyanurates from the PRC, 73
Fed. Reg. 52,645 (Dep't of Commerce Sept. 10, 2008) (notice of
final results); Chlorinated Isocyanurates from the PRC, 73 Fed.
Reg. 62,249 (Dep't of Commerce Oct. 20, 2008) (notice of amended
final results) (collectively, the "Final Results").

The Final Results cover the period of review ("POR") June 1,

---

[1]     Plaintiffs are domestic producers of chlorinated
isocyanurates.

[2]     "'Chlorinated isocyanurates are derivatives of cyanuric
acid, described as chlorinated s-triazine triones. . . . [They
are] available in powder, granular, and tableted forms.'"  *Arch
Chems., Inc. v. United States*, 33 CIT __, __, Slip Op. 09-71 at 3
n.1 (July 13, 2009) (not reported in the Federal Supplement)
(citation omitted).

[3]     Jiheng and Nanning are Chinese producers and exporters
of chlorinated isocyanurates.

2006 through May 31, 2007, and incorporate by reference the

Department's Issues and Decision Memorandum.  *See* Issues and

Decision Mem. for the 2006-2007 Admin. Review of Chlorinated

Isocyanurates from the PRC (Dep't of Commerce Sept. 5, 2008) (the

"Issues & Dec. Mem.").  The court has jurisdiction pursuant to 28

U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(B)(iii)

(2006).

    For the reasons that follow, the Final Results are remanded.


                          BACKGROUND

    Plaintiffs' motion challenges three aspects of the Final

Results: (1) the selection of surrogate values for urea; (2) the

selection of surrogate values for steam coal; and (3) the

valuation of the waste ammonia gas as a by-product.

Defendant-intervenor Arch Chemicals, Inc.[4] fully supports the

Final Results and asks the court to deny plaintiffs' motion.  For

its part, the Department seeks a voluntary remand on the

valuation of the waste ammonia gas by-product, but asks the court

to sustain its Final Results on the first two issues raised by

plaintiffs.  Aspects of plaintiffs' motion were addressed by this

Court when considering the First Administrative Review in *Arch*

_____

    [4]    Arch Chemicals, Inc. is an importer of subject
merchandise and participated in the underlying administrative
review.  *See* Def.-Int.'s Mot. to Intervene 1, Dec. 8, 2008.

*Chemicals, Inc. v. United States*, 33 CIT __, Slip Op. 09-71 (July
13, 2009) (not reported in the Federal Supplement).

On December 14, 2009, the Department filed a motion to
dismiss certain counts in plaintiffs' complaint.  According to
Commerce, plaintiffs' failure to serve their injunction on named
government officials at Commerce and United States Customs and
Border Protection rendered the injunction incapable of preventing
a deemed liquidation.  As a result, the Department insisted that
the court dismiss portions of plaintiffs' complaint as moot
because all entries of the subject merchandise had been
liquidated pursuant to the deemed liquidation provisions of 19
U.S.C. § 1504(d), and because the cash deposit rates at issue in
this litigation had been supplanted by those resulting from the
Third Administrative Review.  Def's Mot. to Dismiss in Part as
Moot 1, Dec. 14, 2009.

On January 15, 2010, the court stayed further action on the
Rule 56.2 motion for judgment on the agency record until the
motion to dismiss was resolved.  The court then denied the motion
to dismiss in *Clearon Corp. v. United States*, 34 CIT __, 717 F.
Supp. 2d 1366 (2010), based on the "intent of the parties"
holding laid out in *Agro Dutch Industries Ltd. v. United States*,
589 F.3d 1187 (Fed. Cir. 2009).

The court now returns to the Rule 56.2 motion for judgment
on the agency record.

DISCUSSION

I.   Surrogate Valuation of Urea

     A.   Legal Framework

     The United States imposes duties on foreign-produced goods
that are sold in the United States at less than fair value.  If
the price of a good in the home market ("normal value") is higher
than the price for the same good in the United States ("export
price"), then the comparison produces a positive number that
indicates that dumping has occurred, and the magnitude of the
number determines the dumping margin.

     In determining whether the subject merchandise is being, or
is likely to be, sold at less than fair value, 19 U.S.C.
§ 1677b(a) requires Commerce to make "a fair comparison . . .
between the export price[5] or constructed export price[6] and normal
value."  When merchandise that is the subject of an antidumping

---

     [5]    The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States" as adjusted.  19
U.S.C. § 1677a(a).

     [6]    The "constructed export price" is "the price at which
the subject merchandise is first sold . . . in the United
States . . . by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or
exporter" as adjusted.  19 U.S.C. § 1677a(b).

investigation is exported from a nonmarket economy country,[7] such
as the PRC, Commerce, under most circumstances, determines normal
value by valuing the factors of production (the "FOPs") used in
producing the merchandise by employing surrogate data.[8]  The
statute directs Commerce to value the FOPs "based on the best
available information regarding the values of such factors in a
market economy country or countries considered to be appropriate
by the [Department]."  19 U.S.C. § 1677b(c)(1).  Specifically,
Commerce's task in a nonmarket economy review is to determine,
using surrogate costs, what a producer's costs would be if the
inputs were valued at market prices.  *See Tianjin Mach. Imp. &
Ex. Corp. v. United States*, 16 CIT 931, 940, 806 F. Supp. 1008,

_____

[7]      A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, because the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate
data from India.  *See* 19 U.S.C. § 1677b(c)(4).

[8]      Section 1677b(c)(4)(A) requires that Commerce "in
valuing factors of production, shall utilize, to the extent
possible, the prices or costs of factors of production in one or
more market economy countries that are . . . at a level of
economic development comparable to that of the nonmarket economy
country."

1018 (1992).


      B.  Surrogate Data for Urea Valuation

          1. Philippine Data

      As it did in the First Administrative Review, Commerce

calculated the surrogate value for the input urea using the

weighted-average unit value of urea imports into India found in

the World Trade Atlas ("WTA"), concluding that the data

represents an average non-export value, and was contemporaneous

with the POR, product specific, and tax exclusive.  *See* Issues &

Dec. Mem. at 8.

      Plaintiffs object to this methodology claiming that: (1)

Commerce failed to make the legally required comparison between

the WTA data and the Philippine data they placed on the record;

and (2) the WTA data contained prices that were not set by market

forces.  According to plaintiffs:

          With respect to the surrogate value for urea, Commerce
          made two basic errors.  First, Commerce misinterpreted
          19 U.S.C. § 1677b to permit selection of a source of
          surrogate value data without comparing it to other
          sources on the record to determine which is the "best
          available information."  In this administrative review,
          two sources of urea price data were available on the
          record: Indian import data and Philippine domestic
          price data.  Instead of comparing both sources to
          determine which was the "best available information,"
          Commerce restricted its evaluation to the adequacy of
          the Indian import data.

Pls.' Mem. in Supp. of Mot. for J. on Agency R. ("Pls.' Mem.") 3.

As to plaintiffs' second argument, they maintain that Commerce erred by "failing to exclude from the Indian import data prices for urea imports from Oman that were not set by market forces." Pls.' Mem. 3.

As noted, plaintiffs contend that Commerce valued the input urea using Indian import data without first assessing the relative merits of the Indian and the Philippine data.  Pls.' Mem. 9.  Therefore, the domestic producers describe Commerce's selection process as limited to a determination of whether the Indian import data (1) satisfied the minimum requirements for use as surrogate data, and (2) met the agency regulation that it "normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (2011).  Plaintiffs characterize this selection process as "foreclos[ing] any objective comparison of the merits of the Indian and Philippine data sets."  Pls.' Mem. 9.

In making their argument, plaintiffs claim that the phrase "best available information" means Commerce "must compare the relative merits of alternative sources of surrogate values on the record."  Pls.' Mem. 19.  Thus, they insist that Commerce did not comply with the statute when it failed to address any of their substantive arguments or conduct an express comparison between the Indian and Philippine data when making its determination. Pls.' Reply Br. in Supp. of Mot. for J. on Agency R. ("Pls.'

Reply") 1.  Looking at the single sentence offered by the
Department to explain its decision not to select the Philippine
data, plaintiffs found nothing "evaluating both data sets with
respect to objective criteria for accuracy or reliability."
Pls.' Reply 1; *see also* Pls.' Mem. 10.

    Commerce's sentence, justifying its decision not to select
the Philippine data, states that the Department found "the
domestic Philippine prices for urea not to be the best available
information on the record of this review because these prices are
for urea used as fertilizer and sold in 50-kg bags which are not
product specific to the urea used by the respondents in this
review."  Issues & Dec. Mem. at 8.  For plaintiffs, this
explanation is mistaken in two "critical respects,"[9] i.e., it
assumes (1) that urea used in agriculture and urea used for
industrial processes are sold in separate markets, and (2) that
the packaging of urea is a material consideration, indicating a
difference between urea used for agriculture and industrial grade
urea used for chemical feedstock.  Pls.' Mem. 10.

    The domestic producers further maintain that Commerce

---

    [9]    First, plaintiffs argue that "there is no record
evidence . . . that 'urea used as fertilizer' can be
differentiated from urea used for chemical production" and, in
fact,
                                            .  Pls.'
Mem. 10.  Second,

                    .  Pls.' Mem. 10.

limited its actual analysis to testing the Indian data for "basic
indicia of adequacy" and, therefore, "failed to take into account
any of the significant differences in the quality and reliability
of the Indian and Philippine urea prices."  Pls.' Mem. 21.  They
believe that the Philippine data is "clearly superior," and
question why Commerce "failed to consider whether a urea price
obtained from an uncontrolled, tax-free, *laissez-faire* urea
market in the Philippines might not be a preferable source of
market-based surrogate values."  Pls.' Mem. 26, 22.

        Plaintiffs, therefore, see Commerce's methodology as
elevating "adequate" or "sufficient" sources of surrogate values
in a primary surrogate country over "superior sources of
information that may exist in alternative surrogate countries,"
thereby creating an "irreconcilable conflict with the plain terms
of the statute."  Pls.' Mem. 22, 23 ("The statutory command to
use the 'best available information' . . . cannot be interpreted
to permit use of information from a primary surrogate country
when objectively superior data exist in a secondary surrogate
country.").  They insist, then, that "Commerce's passing
reference to the Philippine price data plainly did not satisfy
its obligation."  Pls.' Mem. 24.

Court No. 08-00364                                    Page 11

Court No. 08-00364                                    Page 11

The Department[10] explains that it used weighted-average unit
values for Indian imports of urea as listed in the WTA, finding
that the data was "the best available information because they
are average, non-export values, contemporaneous with the period
of review, product specific, tax exclusive, and in-line with
import values from other potential surrogate countries."  Def.'s
Opp. to Pls.' Mot. for J. on Agency R. ("Def.'s Mem.") 8.
Moreover, using the Indian data conformed with Commerce's
preference to value all factors within a single surrogate
country.  Def.'s Mem. 9.  *See* 19 C.F.R. § 351.408(c)(2) ("[T]he
[Department] normally will value all factors in a single
surrogate country.").

The Responding to plaintiffs' argument that its analysis of the
Indian and Philippine data was inadequate, the Department claims
that it did consider the merits of Philippine domestic pricing
data, and determined that the data "were not product specific to
the large-scale industrial usage of chemical feedstock urea
reported by Chinese respondents in the present case and was
therefore not the best available information."  Def.'s Mem. 14.
In making its argument, the agency quotes defendant-intervenor's
comment that purchase of urea in small bags, as it is sold in the

_____

        [10]   Defendant-intervenor's arguments are substantially
similar to the Department's.  Thus, only Commerce's arguments are
summarized below.

Philippines, would be "ludicrous" for the purpose of making the subject merchandise.  Def.'s Mem. 15.

Commerce further explains that Philippine domestic pricing data exclusively represents urea used as fertilizer, while the record evidence establishes there are distinct markets for urea used in agriculture versus industrial processes.  The Department points to plaintiffs' submission from a chemical industry website stating that "[a]n estimated 10-15% of urea manufactured is used in industrial processes . . . .  The balance is used in agriculture."  Pls.' Submission to Commerce Regarding Surrogate Values for FOPs, Ex. 14, May 27, 2008 (C.R. 834) ("Pls.' Surrogate Value Subm.").  The Department, then, concluded that the WTA data "represent a broad category of urea," and "better captures the industrial grade urea reported by respondents." Def.'s Mem. 15.

> ## 2. Commerce's Conclusions Were Reached Without the Required Analysis

While the Department's analysis indicates some examination of the disadvantages of the Philippine data, at the very least, "selecting the surrogate value data that yield the most accurate dumping margin necessarily requires Commerce to conduct a fair comparison of the data sets on the record."  *Allied Pacific Food (Dalian) Co. Ltd. v. United States*, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313—14 (2006).  In addition, the Supreme Court has

"frequently reiterated that an agency must cogently explain why
it has exercised its discretion in a given manner." *Motor
Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
29, 48 (1983).  Commerce's analysis of the input urea violates
both of these principles.[11]

        Here, the Department subjected the Philippine data to none
of the tests it used to justify its use of the Indian data, e.g.,
whether it is from a public source or contemporaneous with the
POR.  Nor did Commerce compare the relative merits of the two
urea sources or explain how it reached its conclusions about the
Philippine data.  That is, here the Department took steps
necessary to demonstrate that urea from India met the minimum
standards for use as a surrogate value, but failed to (1) perform
an analysis of the Philippine data using these same standards;
(2) compare the Indian data with the Philippine data in order to
determine which was the "best available information;" or (3)

_____

        [11]    First, "the fact that
                                                        strongly
suggests that no such distinctions [between urea purchased for
fertilizer and industrial uses] exist."  Pls. Reply 4.  Second,

        [i]f packaging size does matter in valuing urea, then
        Commerce




                                                        .

Pls.' Reply 5.

explain its conclusions with respect to product specificity or
the sale of urea in bags, and detail how these conclusions were
reached.  19 U.S.C. § 1677b(c)(1); *see also Peer Bearing
Co.-Changshan v. United States*, 35 CIT __, __, 752 F. Supp. 2d
1353, 1373 (2011) ("[T]he statute requires Commerce to compare
the chosen data set with other data sets on the record and
thereby determine what is the best available information.");
*Globe Metallurgical, Inc. v. United States*, 28 CIT 1608, 1622
(2004), 350 F. Supp. 2d 1148, 1160 ("Commerce must compare the
reliability of each potential surrogate country's values to
determine which values are most reliable."); *Olympia Indus., Inc.
v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1000-01
(1998) ("From the statute, it is clear that Commerce must
identify and use the best information available when it values
the factors of production. . . . [Therefore,] Commerce has an
obligation to review all data and then determine what constitutes
the best information available or, alternatively, to explain why
a particular data set is not methodologically reliable.")
(citation omitted).

        Thus, the court finds that Commerce's explanation for its
decision to disregard the Philippine data does not comply with
the unfair trade laws, and that its failure to adequately support
its conclusions with reasoning based on the record evidence
reveals that these conclusions were not supported by substantial

evidence.

        3. Omani Prices

     Plaintiffs' primary argument with respect to the inclusion

of the Omani prices in the WTA data is that because one hundred

percent of the Oman India Fertiliser Company ("OMIFCO") output is

sold to the Indian government at predetermined prices, the prices

are necessarily not set by the market.  Indeed, the "prices for

the Omani imports do not involve typical competitive forces of

supply and demand that characterize arm's-length market

transactions among buyers and sellers."  Pls.' Mem. 27.  Similar

arguments were advanced in *Arch Chemicals* where the Court

addressed this issue and found that Commerce's decision to

include the Omani prices was supported by substantial evidence:

> Here, the WTA data is from a publicly available source
> for the POR.  Additionally, Commerce analyzed that data
> to ensure that "value for imports from Oman to India
> was not aberrational, and was comparable to imports
> from other market economy countries."  Def.'s Br. 11
> (citation omitted).  As has been seen, the Omani value
> was within the range of values examined, though at the
> low end, and was close to the average value, i.e., 6.99
> rupees/KG for Oman and 8.83 rupees/KG for the average
> of all data sets. . . . In addition, Commerce acted
> reasonably in concluding that "economies of scale is
> one factor contributing to OMIFCO's price [being lower
> than that of other urea imports into India], given the
> quantity of imports from Oman into India."  *See* I&D
> Mem. at Comment 1; Def.'s Br. 12 (noting that "the
> quantity of Omani imports of urea was higher than the
> quantity of all other Indian imports of urea
> combined").  Thus, having found that the OMIFCO data
> was "within the normal range" and taking into
> consideration the large quantity of OMIFCO imports, it
> cannot be said that Commerce was unreasonable in using
> this information.

> Moreover, the court is unconvinced that Commerce erred
> by not excluding the OMIFCO data as tainted by reason
> of government involvement.  Oman and India are market
> economy countries and there is no evidence that, at the
> time the contract was entered into, the prices set were
> not market-driven.  In addition, Commerce could
> reasonably find that, the mere fact that a product is
> sold to a single purchaser pursuant to a long-term
> contract, does not necessarily make the price
> anomalous.  Further, there was no record evidence
> demonstrating that urea sales made subject to the
> contract were distorted.

*Arch Chems.*, 33 CIT at \_\_, Slip Op. 09-71 at 28—30.

Here, however, the facts are not precisely the same as in

the First Administrative Review that was the subject of *Arch*

*Chemicals*.  There, it was significant that the Omani import data

was "within the range of values examined" when compared to other

imports of urea into India, and there was also one urea source

priced lower than the Omani value.  *Id.* at \_\_, Slip Op. 09-71 at

29.  In this Second Review, it appears that the Omani data no

longer fall within this range.  In fact, the Government of India

noted that the "fixed price of imported urea from Oman is much

cheaper than the present prevailing international prices."  Pls.'

Rebuttal Comments on Surrogate Values for FOPs, Ex. 4 at 11, Nov.

13, 2007 (P.R. 692).  An examination of a table of the prices

confirms this observation.  *See* Prelim. Surrogate Value Mem.,

Attach. 3, Apr. 29, 2008 (P.R. 820) ("Surrogate Value Mem.")

(adopted by Issues & Dec. Mem. 6).

| Country | Quantity (KG) | Average Value (Rupees/KG) |
|---|---|---|
| Oman | 1,500,193,218 | 7.87 |
| Liberia | 26,451,000 | 11.49 |
| Bahrain | 24,003,000 | 11.58 |
| Egypt | 99,887,000 | 11.63 |
| Russia | 118,252,000 | 11.67 |
| Saudi Arabia | 100,085,000 | 11.70 |
| Ukraine | 1,036,565,024 | 11.73 |
| Malaysia | 69,397,000 | 11.74 |
| Romania | 44,000,000 | 11.76 |
| Kuwait | 94,831,700 | 11.78 |
| Bangladesh | 116,260,000 | 11.78 |
| United Arab Emirates | 250,283,278 | 11.81 |
| Libya | 141,291,921 | 11.87 |
| Qatar | 220,282,807 | 12.18 |
| Germany | 5,000,200 | 15.35 |
| **Total** | 3,846,783,148 | 10.26 |

As has been noted, in *Arch Chemicals*, the Omani value was at the low end of sales prices, at 6.99 rupees per kilogram. Although this price was less than the average unit value of 8.83 rupees per kilogram for all data sets for imports into India, it was not outside the range of all values because urea sourced from the United Kingdom was priced at 6.67 rupees per kilogram, while that from Germany was priced at 30.26 rupees per kilogram. *Arch Chems.*, 33 CIT at __, Slip Op. 09-71 at 29. In this Second Review, though, the Omani value, at 7.87 rupees per kilogram, was

the lowest value considered, and was 30% lower than the average

unit value of 10.26 rupees per kilogram for all data sets.  *See*

Surrogate Value Mem., Attach. III.  In fact, the next lowest

value that was considered, that for Liberia, was 46% higher than

the Omani value, and the remaining values ranged from 47% to 95%

more than the Omani value.  Surrogate Value Mem., Attach. III.

This change from the First Administrative Review is significant

and eliminates one of the two important factors upon which the

Court relied in *Arch Chemicals,* because in this review it cannot

be said that "the Omani value is within the range of values

examined."  *Arch Chems.*, 33 CIT at __, Slip Op. 09-71 at 29.

Furthermore, the *Arch Chemicals* Court found it significant

that "'the quantity of Omani imports of urea was higher than the

quantity of all other Indian imports of urea combined'" in

finding that Commerce reasonably concluded that "'economies of

scale [was] one factor contributing'" to the low Omani value.

*Arch Chems.*, 33 CIT at __, Slip Op. 09-71 at 29.  By contrast,

here the correlation between quantity and price is less

pronounced.  In this Second Review, the Omani inputs comprise

less than 40% of the total during the POR, and, while Ukraine's

export quantity was the second highest after Oman, its prices

fell about midway down the list of values.  Similarly, the United

Arab Emirates had the third largest export quantity, but its

prices fell within the top four highest among those considered.

*See* Surrogate Value Mem., Attach. III.  All of this being the
case, the court cannot conclude that Commerce's "economies of
scale" explanation is supported by substantial evidence in this
Second Review.

   One factor in this Second Review, however, remains
consistent with the First Review.  In *Arch Chemicals*, the Court
found that there was no evidence that the data was "tainted by
reason of government involvement."  *Arch Chems.*, 33 CIT at __,
Slip Op. 09-71 at 30.  That is, the fact that "a product is sold
to a single purchaser pursuant to a long-term contract . . . does
not necessarily make the price anomalous."  *Id.*  Similarly, here,
there does not appear to be any evidence on the record that
demonstrates how India's long-term contract with Oman tainted the
sale prices of urea.

   The court is aware that its task is not to "reweigh the
evidence or substitute its own judgment for that of the agency,"
*Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267,
1272,(2004), but rather to determine whether Commerce's
determinations are supported "by substantial evidence on the
record."  19 U.S.C. § 1516a(b)(1)(B)(I); *see also Hoogovens Staal
Bv v. United States*, 24 CIT 242, 247, 93 F. Supp. 2d 1303, 1307
(2000) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620
(1996)) ("In reviewing agency determinations, the court declines
to reweigh or reinterpret the evidence of record.").  Indeed,

"when reviewing substantial evidence challenges to Commerce's
actions, the court assesses whether the agency action is
'unreasonable' given the record as a whole." *Catfish Farmers of
Am. v. United States*, 33 CIT __, __, 641 F. Supp. 2d 1362, 1366
(2009) (citing *Nippon Steel Corp. v. United States*, 458 F.3d
1345, 1350-51 (Fed. Cir. 2006)).  Here, given the data on the
record, and in light of its differences from the data used in
*Arch Chemicals*, the court finds that Commerce's explanation for
the inclusion of the Omani data is not supported by substantial
evidence, as the Omani data no longer falls within the range of
values considered, and this price discrepancy cannot be
attributed to the quantity of urea imported from Oman.


II.  Surrogate Valuation of Steam Coal

     Next, in the Final Results, Commerce valued steam coal using
the prices listed in the Tata Energy Research Institute ("TERI")
Data Directory and Yearbook.  Plaintiffs argue that a producer of
chlorinated isocyanurates in India could not purchase steam coal
at these prices.  They insist that only purchasers in certain
"core sectors" could buy coal at the prices listed in the TERI
data, while purchasers in non-core industries could purchase
domestic coal only at significantly higher prices from the
monopoly supplier, Coal India, or would have been required to use
imported coal.  Pls.' Mem. 30—31.  Plaintiffs argue that although

the coal sector may have been deregulated in name, in practice, non-core sector buyers in India cannot purchase coal at TERI prices.  Pls.' Reply 10 n.3.  Plaintiffs therefore urge the use of the WTA Indian import data.  Pls.' Mem. 30.

According to plaintiffs, the record includes an express identification of precisely which industries are "core sector," and this list plainly shows the chemical industry is not a member.  Pls.' Mem. 31.  Indeed, they insist that "every piece of evidence on the record demonstrates that the chemical industry is *not* part of the core sector in India."  Pls.' Mem. 32.  Thus, plaintiffs argue that "[i]t makes no sense for Commerce to choose as the 'best available information' for valuing steam coal a surrogate value that would be *unavailable* to a hypothetical free-market producer of chlorinated isocyanurates operating in the structure of the Indian market."  Pls.' Mem. 32.

In response, the Department asserts that it used the TERI data, rather than WTA import data as proposed by plaintiffs, "because the TERI data are more product specific to [defendant-intervenor's] reported coal input."  Def.'s Mem. 17. As Commerce explains, TERI data is categorized by the major types of coal products, while WTA import data simply lists "steam coal" without further specificity.  Def.'s Mem. 17.

With respect to plaintiffs' argument that a producer of chlorinated isocyanurates could not purchase steam coal at the

prices listed in the TERI data, the Department contends that the
record evidence regarding the "core sector" was "inconclusive,"
with no clear evidence that purported to classify the Indian
chemical industry as either a core or non-core industry.  Def.'s
Mem. 18.  In addition, Commerce stresses that it has repeatedly
found the use of TERI data to be the best available information
for steam coal prices in India, a conclusion that has been
affirmed by this court.  Def.'s Mem. 18.

In *Arch Chemicals*, which decided the appeal of the First
Administrative Review, this Court held that "Commerce acted
reasonably in using the TERI data to value steam coal." *Arch
Chems.*, 33 CIT at ___, Slip Op. 09-71 at 41.  The Court found that
Commerce was reasonable in determining that "the TERI data was
the most 'product specific' surrogate available, and therefore
the most representative of Jiheng's actual coal input." *Id.*  In
reaching this conclusion, the Court noted Commerce's observation
that "'TERI Data are categorized by major types of coal and UHV
value whereas WTA import data are listed under 'steam coal'
without further specificity.'" *Id.* (citation omitted).

In addition, the *Arch Chemicals* Court found that the
evidence indicated that Commerce was reasonable in concluding
that coal was available to the chemical industry at TERI prices.
In reaching this conclusion, the Court cited to record evidence
that "revealed that deregulation occurred in 1996 and that the

coal used by Jiheng has been sold at market prices since 2000."
*Id.* The Court also observed that one source referenced by
plaintiffs (defendant-intervenors in that action) on the "core
sector" point was "at best equivocal," "while the other article
appear[ed] to support Commerce's position." *Id.* at __, Slip Op.
09-71 at 42. The first source noted that "'customers in the non-
core sector are of three types - linked customers, non-linked
customers, and small and tiny industries,'" while the second
referenced companies "being 'in the core sector like power, steel
and *chemicals*.'" *Id.* Thus, the Court concluded:

> The court finds that the evidence cited by Commerce
> meets the substantial evidence test. Put another way,
> the Department has shown that: (1) the TERI data
> represents most closely the coal actually used by
> Jiheng, and (2) Clearon and OxyChem's claim that TERI
> data prices were unavailable to chemical manufacturers
> like Jiheng is, at best, subject to conflicting
> interpretations of the record evidence. . . .
> Accordingly, the court finds the Department's
> explanation to be reasonable and sustains Commerce's
> surrogate value calculation for steam coal.

*Id.* at __, Slip Op. 09-71 at 43 (citation omitted).

Although the *Arch Chemicals* Court found that Commerce's use
of the TERI data to value steam coal was supported by substantial
evidence in the First Administrative Review, the record in this
Second Review directs a different result. Plaintiffs emphasize
that the "record includes an express identification of precisely
which industries are 'core sector' industries, and this list
plainly shows that the chemical industry is *not* a member of the

core sector." Pls.' Mem. 31. Among the exhibits placed on the record by plaintiffs are a listing of core sector industries from Coal India's website, an interview with Coal India's Marketing Director that occurred during the POR, a decision from the Supreme Court of India, and various industry articles. Pls.' Mem. 13; Pls.' Surrogate Value Subm., Ex. 17, 32, 35. The list on Coal India's website includes the following "Core Sector Consumers": power, defense, railways, fertilizer, steel and other metallurgical industries, cement, aluminum, paper, public sector undertakings, and coal exports. Pls.' Mem. 14; Pls.' Surrogate Value Subm., Ex. 17.

Additionally, Coal India's Marketing Director stated in his interview that Coal India "has basically two sets of consumers - the core sector and the non-core sector. The core sector consists of power, cement, steel, paper, aluminum, and fertilizer manufacturing units, and Central public sector undertakings." Pls.' Mem. 31-32; Pls.' Surrogate Value Subm., Ex. 35. Plaintiffs emphasize that none of the lists of core sectors on the record include the chemical industry. Pls.' Mem. 31. Finally, a January 2006 Supreme Court of India decision provided by plaintiffs characterizes the domestic coal market in India as follows:

> "[A]fter nationalization, coal consumers were
> categorized into two main sectors, namely, core sector
> and non-core sector.  The core sector consumers include
> the vital sections of national economy related to
> infrastructural development as for example, power,
> steel, cement, defence, fertilizer, railway, paper,
> aluminum, export, central public sector undertaking
> etc.  *All other remaining industries/consumers
> constituted non-core sector.*"

Pls.' Mem. 31; Pls.' Surrogate Value Subm., Ex. 17.

Having provided these various examples, plaintiffs believe
that Commerce's determination that, "because there was 'no
conclusive record evidence identifying the chemical industry as a
non-core industry' the Department would assume that it was in the
'core sector,'" is "a quintessential example of a decision that
is *not* supported by substantial evidence on the record."  Pls.'
Mem. 31 (quoting Issues & Dec. Mem. 11).

Despite the presence of this record evidence, Commerce
determined that "we find no conclusive record evidence
identifying the chemical industry as a non-core industry.  While
the record evidence lists examples of 'core' industries, this
list is not exhaustive, and there is no listing positively
identifying the chemical industry as a non-core industry."
Issues & Dec. Mem. 11.  Defendant therefore argues that
plaintiffs "failed to demonstrate that the chemical industry is a
non-core industry," and thus "Commerce properly concluded that
the record evidence on this issue was inconclusive."  Def.'s Mem.
18.  Defendant also asserts that "Commerce has found consistently

in recent cases that the TERI data are the most appropriate
source for steam coal prices in India." Def.'s Mem. 18; Issues &
Dec. Mem. 11.  Finally, defendant argues that Commerce used the
TERI data because it is "more product specific" to the type of
coal used by Jiheng as the "TERI data are categorized by major
types of coal," while the WTA import data simply list "'steam
coal' without further specificity."  Def.'s Mem. 17.  Thus,
because the TERI data represent the most product-specific prices,
defendant argues that the data constitute the best available
information.

    While defendant maintains that "there is no listing
positively identifying the chemical industry as a non-core
industry," Issues & Dec. Mem. 11., it is equally apparent that
there is no list that identifies the chemical industry as a core
sector industry.  Nor, for that matter, does the record contain
any evidence that would lead the court to conclude, as it did in
*Arch Chemicals*, that the evidence is subject to "conflicting
interpretations."  That is, absent from this record is the
evidence this Court found important in *Arch Chemicals,* i.e., the
Coal India documents that "'clearly specified that the type of
coal used by Jiheng had been deregulated in 1996 and has been
sold at market prices since 2000,'" and the BioLab submission
that referenced companies being "'in the core sector like power,

steel and chemicals.'"  *Arch Chems.*, 33 CIT at __, Slip Op. 09-71
at 40, 42 (citations omitted).

While Commerce concludes that the lists of core sector
industries provided by plaintiffs were "not exhaustive," it does
not discuss the record evidence that supports this conclusion, or
explain how it reached this finding.  It also fails to address
the record evidence from the Supreme Court of India's decision
that listed several industries, not including the chemical
industry, and stated that "[a]ll other remaining
industries/consumers constitute[] non-core sector."  Pls.' Mem.
31; Pls.' Surrogate Value Subm., Ex. 17.  In other words, the
Department fails to address a court decision that certainly
appears to be definitive.

Although Commerce's conclusion with respect to the
specificity of coal types reported in the WTA and TERI data is
important, so are its conclusions with respect to core
industries.  As these conclusions are not fully explained, and
there appears to be no record evidence to support the conclusion
that the chemical industry is a core sector industry, the court
finds that the surrogate value calculation for steam coal must be
remanded as not supported by substantial evidence.  On remand,
Commerce "must explain its rationale . . . such that a court may
follow and review its line of analysis, its reasonable

assumptions, and other relevant considerations." *Allegheny Ludlum Corp. v. United States*, 29 CIT 157, 168, 358 F. Supp. 2d 1334, 1344 (2005).  Its conclusions should be supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

III. Surrogate Valuation of Waste Ammonia Gas By-Product Offset

The Department generally grants an offset to normal value for sales of by-products, generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value, and reenters the respondent's production process. *See Arch Chems. v. United States (Arch Chems. II)*, 35 CIT __, __, Slip Op. 11-41 at 5—6 (Apr. 15, 2011) (not reported in the Federal Supplement).  In valuing by-product offsets in nonmarket economy proceedings, Commerce uses surrogate values, as it does for other factors of production. *See QVD Food Co. v. United States*, 34 CIT __, __, 721 F. Supp. 2d 1311, 1318 (2010).

By their motion, plaintiffs challenge the Department's decision to value the waste ammonia gas by-product, claimed by Jiheng, using import prices for anhydrous ammonia.  Plaintiffs

contend that "there was no reasonable source of surrogate value on the record for the waste ammonia gas by[-]product of Jiheng's cyanuric acid production" because "Jiheng's waste ammonia gas plainly did not consist of such anhydrous ammonia."  Pls.' Mem. 33, 34.  For plaintiffs, "[b]ecause Jiheng's waste ammonia gas is not comparable to anhydrous ammonia and Jiheng provided no other sources of surrogate values, Commerce should have denied the offset."  Pls.' Mem. 34.

While defendant-intervenor argues this choice is supported by substantial evidence, the Department itself "request[s] a remand to permit Commerce to reconsider and explain its selection of anhydrous ammonia to value Jiheng's ammonia gas by-product offset."  Def.'s Mem. 19.  After reexamining the record, "Commerce has determined that it has not fully explained its reasons for selecting anhydrous ammonia to value Jiheng's ammonia gas by-product offset and that it should therefore reconsider and give further explanation for its decision."  Def.'s Mem. 19. Notably, plaintiffs do not object to this offer in their reply brief.

"[I]f the agency's concern is substantial and legitimate," granting a voluntary remand request "is usually appropriate." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  The court, therefore, grants Commerce's request for a

voluntary remand to reconsider and explain its selection of anhydrous ammonia to value Jiheng's ammonia gas by-product offset.

CONCLUSION AND ORDER

For the reasons stated, it is hereby

ORDERED that plaintiffs' Rule 56.2 motion is GRANTED, in part, and defendant's motion is GRANTED, in part, and the matter is REMANDED; it is further

ORDERED that Commerce issue, upon remand, a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that Commerce, in preparing the Remand Redetermination, shall reexamine its determination with respect to (1) whether urea used for agricultural purposes can be differentiated from urea used for chemical production, and (2) any reason urea sold in fifty kilogram bags cannot be the source of a surrogate price in this case; it is further

ORDERED that Commerce fully analyze the evidence presented by both sides in reviewing its decision to exclude the Philippine data, further examine the Philippine data using the same criteria

it employed in selecting the Indian data, provide a complete comparison of the two data sets, and adequately explain how it has come to its final determination; it is further

ORDERED that Commerce shall revisit its determination with respect to the Omani prices, fully analyze the evidence regarding the Omani data, and fully explain and support with substantial evidence its determination of whether or not to include the Omani data in the WTA data; it is further

ORDERED that Commerce revisit its determination with respect to its surrogate valuation of steam coal, and fully analyze the use of the TERI data, including whether the chemical industry would be considered a core sector industry, and whether the use of this data is supported by substantial evidence; it is further

ORDERED that Commerce's request for a voluntary remand to reconsider and explain its selection of anhydrous ammonia to value the ammonia gas by-product offset is GRANTED, and Commerce shall, on remand, reconsider and fully explain its decision and its reasons for selecting anhydrous ammonia; it is further

ORDERED that Commerce shall fully explain why the data it has selected for all remanded issues constitutes the best available information, demonstrating that each of its conclusions are supported by substantial evidence, and may reopen the record if it finds that the existing record is inadequate; it is further

Court No. 08-00364                                      Page 32


        ORDERED that Commerce file the remand results on or before

March 19, 2012; it is further

        ORDERED that plaintiffs file any comments thereon on or

before May 3, 2012; it is further

        ORDERED that defendant file any rebuttal to such comments on

or before May 18, 2012.


                                    _____/s/ Richard K. Eaton_____
                                          Richard K. Eaton


Dated:       November 18, 2011
             New York, New York